# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

| | |
|---|---|
| CAPITAL CONCEPTS, INC.<br>*Plaintiff,*<br><br>v.<br><br>CDI MEDIA GROUP CORPORATION ET AL.,<br>*Defendants.* | CASE NO. 3:14-cv-00014<br><br>**Memorandum Opinion**<br><br>JUDGE NORMAN K. MOON |

This matter is before the Court on Plaintiff's Motion for Default Judgment and Defendants' Motion to Set Aside Entry of Default. Due to the strong presumption in favor of hearing cases on the merits, I will deny Plaintiff's motion and grant Defendant's motion. However, I will order Defendants to produce to Plaintiff the documents referenced in the License Agreement within seven days, and to pay all of Plaintiffs' fees and costs associated with seeking entry of default and default judgment against Defendants.

## I. BACKGROUND

### A. *Factual Background*

Plaintiff is Capital Concepts, Inc., which does business as bCreative, Inc. bCreative is a Virginia corporation with its principal place of business in Charlottesville, Virginia. bCreative licenses content from third parties, which it then sublicenses to other third parties for use on consumer products like t-shirts and posters. The Defendants are CDI Media Group Corporation and Javier R. Perez. CDI is a corporation organized under the laws of Texas and having its principal place of business in California. CDI touts itself as an international sports marketing agency focusing on the representation of soccer players, and also claims to have significant

1

experience in corporate branding and licensing. Perez is President and CEO of CDI, and Plaintiff's complaint claims Perez is CDI's sole shareholder. He is a citizen of California.

In June 2013, bCreative's president, Scott Gardiner, was approached at a trade show by a third party[1] and presented with a potential licensing arrangement for posters depicting three of the best known soccer players in the world: Lionel André Messi ("Messi"), Neymar da Silva Santos Júnior ("Neymar") and Cristiano Ronaldo ("Ronaldo"). A conference between Gardiner and Perez was arranged, and at the conference, Perez told Gardiner that he was formerly a Director of Marketing for FIFA, had personal relationships with the three players, and that CDI had the right and license to use the photograph, likeness, endorsement, and other indicia of the three players.[2] CDI and bCreative executed a non-disclosure agreement following the meeting, and Perez sent Gardiner, who was located in Charlottesville, Virginia, an "Athlete Endorsement Agreement," allegedly signed by each player and awarding CDI the rights Perez claimed to possess.

Over the course of several discussions in the summer of 2013, Perez solicited Gardiner in Charlottesville, Virginia to license the right to use nine specific photographs, three per player, claiming Perez had the right to use and license the photographs in question. In the course of these

---

[1] While certain allegations in Plaintiff's Complaint are somewhat vague, these allegations and others are taken as true as a result of Defendants' default. *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001); *see also City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011) ("It is an ancient common law axiom that a defendant who defaults thereby admits all well-pleaded factual allegations contained in the complaint.").

[2] Although the Complaint does not specify where the trade show and initial meeting took place, Plaintiff claims all subsequent dealings proceeded with Perez soliciting, corresponding, and sending documents to Gardiner in Charlottesville, Virginia. Perez has not denied this allegation in challenging this Court's personal jurisdiction over him. Although Perez asserts that this Court only has jurisdiction over the company for which he worked in undertaking these transactions with Gardiner, Plaintiff alleges that the company Perez claimed to represent was not a legitimate business entity. *See* Compl. ¶ 50–51 (averring Perez dealt with Gardiner as a representative of a certain entity, but that "the employer identification number for [that] CDI [entity] provided by Mr. Perez appears to have been completely fabricated and is not associated with any company. Upon information and belief, Mr. Perez made such representations intentionally and knowingly . . . ."). Plaintiff's allegation, taken as true at this stage, suggests Perez may have dealt with Gardiner in a personal capacity, especially if the companies he claimed to represent did not exist. This allegation further supports this Court's personal jurisdiction over Perez.

discussions and others, Perez reached out and sent documents to Gardiner in Charlottesville, Virginia. Messi plays soccer for Futbol Club Barcelona ("FC Barcelona"), whose players wear a traditional home uniform featuring vertical stripes delineated in alternating colors of scarlet and blue. In one of the photographs of Messi, he was wearing such a uniform, and Perez stated that once the photograph was scrubbed of the FC Barcelona name and logo, Perez had a license to use the photograph and create posters and other products containing the image. Based on these representations, bCreative entered into a "Licensor Master License Agreement" with CDI on July 22, 2013, providing that the parties would agree to "Active Licenses" for specific players, with the first three entered contemporaneously. Schedule 1 had CDI licensing the three Messi photographs for use[3] on "Posters and Postcards of any size, shape, and quantity" worldwide. The same was done with Schedule 2 and 3 for the photographs of Neymar and Ronaldo.

Perez next represented to Gardiner that he had agreements with certain Mexican soccer players as well. bCreative entered into the following schedules on August 1, 2013: Schedule 4, granting bCreative worldwide rights to publish posters and postcards using a photograph of Javier "Chicharito" Hernandez; Schedule 5, which gave the same for a photograph of Aldo de Nigris; and Schedule 6, which gave the same for one photograph of each of certain Mexican soccer players (Javier "Chicharito" Hernandez, Aldo de Nigris, Diego Reyes, Gerardo Torrado, and Jesus Corona).

bCreative entered into an agreement with Trends International Publishing Corporation ("Trends"), granting Trends the right to create and sell posters in North America containing the images bCreative had licensed from CDI. bCreative also approached Pyramid International (UK) ("Pyramid"), and Pyramid stated that it would be interested in a license if bCreative could

---

[3] These licenses allowed bCreative the right to "use, publish, manufacture, sell, distribute, advertise, promote, sub-license or license posters and postcards of any size, shape, and quantity."

3

acquire the rights to use the photographs in France, Italy, Spain, and the United Kingdom. These countries had originally been excluded from bCreative's license from CDI. Perez informed Gardiner that he could acquire those rights, eventually stating that he had negotiated a written addendum with each player granting such additional rights in exchange for a "Player's Rights Fee" of $10,000 per player. bCreative paid CDI the $10,000 fee for each of the three players and entered into the following Schedules in its agreement with CDI: Schedule 7, granting bCreative rights to use the Messi photographs in Europe; Schedule 8, granting bCreative rights to use the Neymar photographs in Europe; Schedule 9, granting bCreative rights to use the Ronaldo photographs in Europe. Perez provided the images of each player to be used, scrubbed of the brands and logo. bCreative then granted Pyramid a license to sell the images in France, Italy, Spain, and the United Kingdom.

The License Agreement stated that Perez and CDI had the right to grant bCreative the rights to use the photographs that were licensed to bCreative under the License Agreement, having obtained all the necessary third-party rights. CDI specifically represented in Section 5(b) of the License Agreement "that the Active Licenses as used under the terms and conditions of this [License] Agreement by bCreative and/or any Licensee Member [i.e. bCreative's licensees] *do not infringe any rights, including any intellectual property rights and rights of publicity, of any third party,* and that bCREATIVE *is relying on the representations and warranties made by Licensor [CDI]* in this Agreement." (emphasis added). The License Agreement also provided in Section 5(a) that if "there are any other releases or licenses involved in granting rights to the LICENSOR [CDI] for the Active Licenses, then LICENSOR shall furnish fully executed copies of such documents within 3 business days of bCREATIVE'S written request." In Section 13(a), CDI agreed to defend and indemnify bCreative against any claims made by third parties.

4

On or about December 1, 2013, Pyramid released the Messi, Neymar, and Ronaldo posters for sale in the United Kingdom and other European countries. A day later, a Pyramid competitor and FC Barcelona licensee, GB Eye Poster Co. ("GB Eye") questioned bCreative and Pyramid's rights to use the images. In January 2014, FC Barcelona contacted Pyramid and bCreative and claimed that the Messi Poster infringed FC Barcelona's rights by, among other things, using FC Barcelona's color combination on Messi's uniform and using Messi's image. Perez assured Gardiner that the Messi poster did not infringe FC Barcelona's rights and that he would send FC Barcelona all the documents needed to prove that the poster was valid. The Complaint alleges that Perez never sent FC Barcelona and Pyramid the required licenses, instead sending a stock photography license which did not give CDI (and thus bCreative and Pyramid) the necessary rights.

FC Barcelona continued to claim that Pyramid's production and sale of the Messi Poster infringed on its rights, and Pyramid in turn informed bCreative that it would seek damages for any lost sales due to FC Barcelona's claims and demands. Gardiner then sent Perez numerous e-mails, texts, and phone messages requesting Perez's assistance in responding to FC Barcelona and Pyramid. Perez allegedly ignored these communications, finally telling Gardiner on February 26, 2014 that he had resigned from CDI due to his "insubordination."[4] Compl. ¶ 34. The Complaint alleges that Perez is the owner and sole employee of CDI[5] and that his resignation was simply an effort to evade bCreative, Pyramid, and FC Barcelona.

---

[4] At the July 21, 2014 hearing, counsel for Defendants disputed this allegation, stating that Perez was instead demoted. At this stage of litigation, I accept the allegation in Plaintiff's Complaint as true. *See Homecomings Fin. Network*, 253 F.3d at 780. I note that regardless of whether Perez resigned or was demoted, Plaintiff essentially alleges that Perez dodged Plaintiff's inquiries—without giving Plaintiff another point of contact--by claiming Perez was taken off the matter or out of the company due to his insubordination. Compl. ¶ 34.

[5] At the July 21, 2014 hearing, Plaintiff's counsel alleged that the CDI whose principal place of business is Texas is distinct from the CDI that Perez claimed to lead during the transactions with Gardiner. Plaintiff's counsel further

5

*B. Procedural Background*

Plaintiff brought suit against Defendants in this Court on April 11, 2014. CDI Media Group was served on April 24, 2014, and substituted service was obtained on Perez on April 29, 2014, by leaving a copy of the Summons and Complaint with Perez's father. Return of Service of CDI Media Group Corporation was entered on May 5, 2014, and return of service of Javier R. Perez was entered on May 20, 2014. With no official response from either defendant having been entered onto the docket, Plaintiff filed a Motion for Clerk's Entry of Default on June 6, 2014. Default was entered for both defendants on June 10, 2014, and Plaintiff filed the pending Motion for Default Judgment two days later, on June 12, 2014. Sixteen days after the Entry of Default, on June 26, 2014, Defendants filed a Motion for Extension of Time to File a Response to the Motion for Default Judgment. I granted the extension on June 30, 2014. On July 7, 2014, Defendants filed the pending Motion to Set Aside Default. I heard argument on the cross-motions on July 21, 2014.

## II. STANDARD OF REVIEW

When confronted with a motion for default judgment, a court may either grant the motion under Federal Rule of Civil Procedure 55(b)(2), or set aside the entry of default for good cause under Rule 55(c). "Once a party defaults, the issue of whether to grant or deny a motion for entry of default judgment is a matter largely within the discretion of the trial court." *Broglie v. Mackay-Smith*, 75 F.R.D. 739, 742 (W.D. Va. 1977); *Payne ex rel. Estate of Calzada v. Brake*, 439 F.3d 198, 204 (4th Cir. 2006) ("'The disposition of motions made under Rule [] 55(c) . . . is a matter which lies largely within the discretion of the trial judge and his action is not lightly to be disturbed by an appellate court.'") (quoting *Consol. Masonry & Fireproofing, Inc. v. Wagman*

---

stated that an investigation revealed that the CDI with which Plaintiff interacted was not registered as a business in California, Texas, or Delaware, and that the tax identification number provided by Perez for that business was false.

6

*Const. Corp.*, 383 F.2d 249, 251 (4th Cir. 1967)). The great weight of authority, however, holds that "the interests of justice are best served by a trial on the merits." *Tolson v. Hodge*, 411 F.2d 123, 130 (4th Cir. 1969).

Accordingly, "Rule [] 55(c) . . . [is] to be liberally construed in order to provide relief from the onerous consequences of defaults." *Id.*; *accord United States v. Moradi*, 673 F.2d 725, 727 (4th Cir. 1982). Furthermore, "[a]ny doubts about whether relief should be granted should be resolved in setting aside the default so that the case may be heard on the merits." *Tolson*, 411 F.2d at 130 (internal citation and quotation marks omitted). The United States Court of Appeals for the Fourth Circuit has "repeatedly expressed a strong preference that, as a general matter, defaults be avoided and that claims and defenses be disposed of on their merits." *Colleton Preparatory Acad., Inc. v. Hoover Universal, Inc.*, 616 F.3d 413, 417 (4th Cir. 2010).

### III. DISCUSSION

#### A. Service of Process

Defendants first claim that service of process was improper upon Perez, which would mean that this Court would have no jurisdiction over Perez and would be bound to set aside the entry of default.[6] *See Harbison v. Virginia*, No. 3:10CV297, 2010 WL 3655980, at *10 (E.D. Va. Aug. 11, 2010) ("Because the Defendants were not properly served, the Clerk's entry of default must be set aside") *report and recommendation adopted sub nom. Harbison v. Commonwealth of Va. ex rel. Cuccinelli*, No. 3:10CV297, 2010 WL 3655977 (E.D. Va. Sept. 10, 2010) *aff'd sub nom. Harbison v. Cuccinelli*, 413 F. App'x 626 (4th Cir. 2011); *see also Bank United v. Hamlett*, 286 B.R. 839, 843 (W.D. Va. 2002) ("As any first-year law student knows, when service of

---

[6] I note that at the July 21, 2014 hearing, counsel for Defendants repeatedly stated that the argument about improper service of process was presented, not in an effort to require default to be set aside, but rather as an effort to show the reasonableness of Defendants' actions under the "good cause" standard for setting aside entry of default. I will address this contention first, however, since Defendants' initial brief states that "DEFAULT AGAINST DEFENDANT MR. PEREZ IS VOID AND MUST BE SET ASIDE." Def.s' Mot. to Set Aside Entry of Default 4.

7

process is ineffective a court does not acquire personal jurisdiction over a party, and a default judgment resulting from such defective service is void.").

However, returns of service like those present on this record act as *prima facie* evidence of valid service. "In the federal system, some courts require a showing of 'strong and convincing evidence' to overcome a facially valid return of service generated by a private process server, while other simply have suggested that a rebuttable presumption of correctness might apply." *Corcoran v. Shoney's Colonial, Inc.*, 39 Fed. R. Serv. 3d 345, 1997 WL 470365, at *2 (W.D. Va. July 31, 1997) (comparing *Trustees of Local Union No. 727 Pension Fund v. Perfect Parking*, 126 F.R.D. 48, 52 (N.D. Ill. 1989), with *Frof, Inc. v. Harris*, 695 F. Supp. 827, 829 (E.D. Pa. 1988)); *see also Frof, Inc.*, 695 F. Supp. at 829 ("[E]ven if this court were to consider that a return of service only creates a rebuttable presumption that proper service was effected, a bare allegation by a defendant that he was improperly served cannot be allowed to bely [sic] the private process server's return.").

Defendants must therefore, at the very least, present credible evidence to rebut the presumption of validity created by the returns of service entered on May 5, 2014, and May 20, 2014. Defendants first present the Declaration of Ann Horowitz, allegedly the "Director Communications for CDI Media Group Corporation," which states: "To the best of my knowledge and belief, the Complaint filed by Plaintiff and Summons was not received by CDI Media from its registered agent for service of process." Br. on Defs.' Mot. to Set Aside Entry of Default, Ex. A. The affidavit is not clear enough about Horowitz's identity or role in CDI to be credible, and the claims she makes are so vague as to have no evidentiary value at all. Furthermore, as her statements relate to CDI Media rather than to Javier Perez, the affidavit is also irrelevant.

8

The declaration submitted by Javier Perez is equally unhelpful, stating that "[m]y father was served with the Complaint and Summons at his residence. I do not live with my father, and his residence is not my dwelling place or usual place of abode." *Id.* at Ex. B. This is precisely the kind of "bare allegation by a defendant that he was improperly served" that "cannot be allowed to bely [sic] the private process server's return." *Frof, Inc.*, 695 F. Supp. at 829. Perhaps realizing the obvious lack of persuasive evidence offered, Defendants submitted a Supplemental Declaration from Perez, with an attached cell phone bill reflecting an address different than the place of substituted service. *See* Defs.' Reply, Ex. A. This evidence also fails to rebut the presumption of valid service. Perez states: "[My] address is 2616 Vanderbilt Lane, Redondo Beach California 90278, as evidenced by the attached Verizon Wireless bill with my name and current address." *Id.* That bill covers the time period of "Jun 04 – Jul 03," 2014. *Id.* At no point in either declaration does Perez forthrightly assert that at the time of service, he did not live with his father.[7]

Defendants' evidence might be somewhat persuasive to show that Perez currently resides at the apartment located at the Redondo Beach address.[8] But a statement of current residence and a phone bill for June through July of 2014 has no evidentiary value in proving that Perez did not reside at the residence where his father was served at the time of service: service occurred on April 29, 2014, more than a month prior to the period covered by the Verizon bill. Accordingly, I find no credible evidence to rebut the presumption of valid service and will not set aside the Clerk's Entry of Default against Perez.

---

[7] At best, this means that Perez's declarations are of no evidentiary value. I observe, however, that submitting multiple declarations that carefully parse language and obfuscate the relevant question could also be an indicia of bad faith.

[8] At the July 21, 2014 hearing, I asked counsel for Defendants why more credible evidence, such as a driver's license or tax records, had not been presented to establish Perez's residence at the time of service. Counsel could not provide any persuasive reason.

9

## B. Good Cause

A court may set aside an entry of default upon a showing of "good cause." Fed. R. Civ. P. 55(c). In determining whether the defaulting party has shown good cause, a district court considers a variety of factors. These include: (1) whether the defendant has a meritorious defense to the substance of the plaintiff's case; (2) whether the defendant acted with reasonable promptness to set aside the entry of default; (3) whether the defendant has a history of dilatory action within the litigation; (4) the personal responsibility of the party opposing default judgment in causing the default; (5) whether the defendant's default prejudiced the plaintiff; and (6) whether there are less drastic sanctions available. *Estate of Calzada*, 439 F.3d at 204–05; *Lolatchy v. Arthur Murray, Inc.*, 816 F.2d 951, 953 (4th Cir. 1987).

"A meritorious defense requires a proffer of evidence which would permit a finding for the defaulting party." *Augusta Fiberglass Coatings, Inc. v. Fodor Contracting Corp.*, 843 F.2d 808, 812 (4th Cir. 1988) (collecting cases). The defense must be supported by facts, not merely conclusory statements. *Burton v. The TJX Companies, Inc.*, No. 3:07-CV-760, 2008 WL 1944033, at *3 (E.D. Va. May 1, 2008). However, the burden on the defendant at this stage of litigation is slight. "All that is necessary to establish the existence of a meritorious defense is a presentation or proffer of evidence which, if believed, would permit the court to find for the defaulting party." *Armor v. Michelin Tire Corp.*, 113 F.3d 1231, at *2 (4th Cir. 1997) (unpublished); *see also Belvac Prod. Mach., Inc. v. Standard Indus. Products Co., Inc.*, No. 6:06CV00034, 2007 WL 1189644, at *2 (W.D. Va. Apr. 23, 2007) ("While the bare allegation of a meritorious defense is insufficient, the defendant's burden is minimal").

Defendants have not stated whether they have a substantive defense to the major allegation of fraud in this case, instead articulating procedural defenses like a lack of personal

10

jurisdiction over Perez and a ripeness challenge to Plaintiff's indemnification claim. *See* Br. on Def.s' Mot. to Set Aside Entry of Default 6–9. Yet, Defendants are not required to present any particular kind of a defense, or persuade the Court of the ultimate validity of the defenses presented, in order to have a meritorious defense for purposes of setting aside default. *See Augusta Fiberglass Coatings, Inc.*, 843 F.2d at 812 (upholding the district court's finding that the defendant had presented a meritorious defense, even though the alleged defenses and counterclaims addressed only the amount of plaintiff's claims); *Burton*, 2008 WL 1944033, at *3 (finding an allegation that Plaintiff's "claim was made outside of the statute of limitations," along with a factual denial, "sufficient to establish a meritorious defense"). Given the low bar for presenting a meritorious defense at this stage of litigation, I find that this factor weighs in favor of granting Defendants' motion to set aside default.

The second factor, reasonable promptness, also weighs in favor of setting aside default. Whether a party has acted reasonably promptly to set aside entry of default must be determined "in light of the facts and circumstances of each occasion . . . ." *Moradi*, 673 F.2d at 727. However, "courts routinely look at other courts' decisions to determine whether a delay is reasonable," and "[d]istrict courts in the Fourth Circuit have found that a defendant acted reasonably promptly when waiting seventeen, twenty-one, and thirty-two days after default was entered before attempting to set it aside." *Burton*, 2008 WL 1944033, at *3; *see also JTH Tax, Inc. v. Callahan*, No. 2:12CV691, 2013 WL 3035279, at *9 (E.D. Va. June 6, 2013) (holding that defendant acted with "reasonable promptness" in filing a motion to set aside default sixteen days after default was entered).

In this case, the Clerk's Entry of Default was filed on June 10, 2014. Defendants filed a Notice of Appearance for counsel and Motion for Extension of Time to File a Response on June

11

26, 2014. This was sixteen days after the entry of default, which was the exact same time period found to be reasonably prompt by the *JTH Tax* court. The delay would still be only twenty-seven days if I were to ignore the filings by Defendants from June 26, 2014, and look only at the time between June 10, 2014 and the July 7, 2014 Motion to Set Aside Default filed by Defendants. Other courts have found delays greater than twenty-seven days to be excusable. *See, e.g., Wainwright's Vacations, LLC v. Pan Am. Airways Corp.*, 130 F. Supp. 2d 712, 718 (D. Md. 2001) (granting Rule 55(c) relief when the period between the entry of default and a motion to vacate the default was thirty-two days). Defendants responded fairly promptly in this case, and this factor weighs in favor of setting aside default.

Regarding the third factor, dilatory actions include, but are not limited to, stalling and ignoring a court's direct order. *See McCain v. Educ. Credit Mgmt. Corp.*, 353 B.R. 452, 464 (Bankr. Ed. Va. 2006). This litigation was only commenced on April 11, 2014, and after Defendants appeared to move this Court to set aside default, all subsequent filings have been prompt. "The court must . . . consider if there is a history of dilatory action by the party in default." *Parks v. Disc. Box & Pallet, Inc.*, No. 5:12CV081, 2013 WL 662951, at *8 (W.D. Va. Feb. 22, 2013). In *Parks*, the court considered it relevant that an insurer "failed to handle [a] claim in a prompt and professional manner as it repeatedly failed to return phone calls and respond to emails." *Id.* Here, Plaintiff has alleged a pattern of stalling and dilatory action on the part of Defendants before responding in this case, including a period of months where Perez similarly avoided e-mails and calls from Gardiner. Pl.'s Compl. at 12. Accordingly, I do not find that this factor weighs in Defendants' favor.

The fourth factor is related and focuses on the personal responsibility of the party opposing default. The Fourth Circuit often finds that default should be set aside when a

defaulting party's attorney is to blame for the delay. *See, e.g.*, *Allison v. Eco Tech/Ram-Q Indus., Inc.*, 993 F.2d 1535, at *2 (4th Cir. 1993) (unpublished) (explaining partial justification for reversing a district court that did not set aside default, noting that "[t]he failure of lawyers . . . to abide by the rules and respond in a timely manner has not been shown to have existed because of steps solely attributable to the client"); *Moradi*, 673 F.2d at 728 ("[J]ustice also demands that a blameless party not be disadvantaged by the errors or neglect of his attorney"). In this case, it appears as if Defendants themselves caused the early delays, with Defendants' corporate counsel allegedly attempting to engage in settlement negotiations with Plaintiff and then taking a considerable amount of time to retain local counsel. Thus, while filings have been prompt ever since Defendants' local counsel entered his notice of appearance in this case, I do not find that Defendants were blameless in causing the delay. This factor does not weigh in favor of setting aside default.

Importantly, Plaintiff was not prejudiced by Defendants' delay, considering the standard for finding prejudice on a motion to set aside entry of default. In determining whether a party was prejudiced by a default, a court considers: (1) whether the delay made it impossible for the aggrieved party to present certain evidence; (2) whether the delay hampered the non-defaulting party's ability to proceed with trial; (3) whether the delay impaired the non-defaulting party's ability to complete discovery; and (4) whether the delay was used by the defaulting party to commit a fraud. *Lolatchy*, 816 F.2d at 952–53; *Burton*, 2008 WL 1944033, at *4. Plaintiff argues that it "has suffered and will continue to suffer harm" because its "exposure and its actual losses grow each and every day" that the posters in question are not on the market. Pl.'s Resp. 22–23. Mounting losses may make a larger damages award appropriate should Plaintiff ultimately prevail in this litigation. Yet, mounting losses do not make it more difficult for Plaintiff to prove

13

its case, which is the focus of the inquiry into whether a Plaintiff has suffered prejudice from default. *See Hoover Universal*, 616 F.3d at 419 (holding that "no cognizable prejudice inheres in requiring a plaintiff *to prove* a defendant's liability, a burden every plaintiff assumes in every civil action filed in every federal court") (emphasis in original).

Plaintiff also alleges that there is risk that Defendants might use the delay to divert assets in order to avoid paying a judgment, perpetrating a kind of fraud. *See Franchise Holding II, LLC v. Huntington Restaurants Group, Inc.*, 375 F.3d 922, 926 (9th Cir. 2004). But I cannot find, based on this unsupported suggestion, that the risk of diverting assets is great enough to prejudice Plaintiff, particularly since this same risk might exist even if Defendants had more promptly responded. It appears that Defendants' delay has mainly been a source of inconvenience and frustration for Plaintiff, and although those reactions are understandable, they are also insufficient to amount to prejudice. *Lolatchy*, 816 F.2dd at 953–54. The fourth factor therefore weighs in favor of setting aside the entry of default.

The final factor to consider is "whether there are less drastic sanctions [than entry of default judgment] available." *Estate of Calzada*, 439 F.3d at 205. This factor often proves crucial in the analysis of whether to set aside default. *See, e.g.*, *Hoover Universal*, 616 F.3d at 418 ("Moreover, the district court acknowledged its awareness that a less drastic sanction than maintaining the entry of default must be considered . . . although it never explained, nor even mentioned in its order, why an award of attorney's fees and costs [to the plaintiff] in opposing the motion to set aside the entry of default, as [defendant] suggested, would be inappropriate"); *Lolatchy*, 816 F.2d at 953 ("The attorney, for example, could have been charged with all costs and expenses attendant to the delay, including attorney's fees, or even held in contempt of court.

There is nothing in the record to suggest that either of these actions would not have promptly cured his failure to respond").

Plaintiff has asserted in this case that "[t]here is no lesser remedy than entry of default to address Perez and CDI's continued and repeated failure to comply with the License Agreement." Pl.'s Resp. 24. However Plaintiff undercuts this claim by proposing lesser sanctions as an alternative argument:

> [I]f the Court sets aside the entry of default, then it should also order Defendants to comply with the License Agreement and to produce to bCreative and its counsel any documents involved with the granting of the licenses to CDI from the original rights holders within seven days. In addition, due to Defendants' refusal to appear in this action until default was entered, and their continued delay and refusal to communicate meaningfully with bCreative about resolving its request for the production of the required documents, the Court should also order Defendants to reimburse bCreative for all its costs and expenses, including its attorneys' fees, through final resolution of its Motion for Default Judgment and incurred since April 24, 2014, the date process was served, or, alternatively, since June 6, 2014, the date Defendants' attorney knew of the impending Motion for Entry of Default.

*Id.* at 26.

I find these proposed alternative sanctions extremely reasonable, and that granting them would be in keeping with Defendants' "request that the Court consider any other less drastic remedy other than prohibiting [Defendants] from defending themselves on the merits of the case." Def.s' Mot. to Set Aside Entry of Default 13. The License Agreement expressly provides in Section 5(a) that if "there are any other releases or licenses involved in granting rights to the LICENSOR for the Active Licenses, then LICENSOR shall furnish fully executed copies of such documents within 3 business days of bCREATIVE'S written request." Compl., Exs. 2, 4. Refusal to turn over all documentation proving Defendants' rights to license the materials covered by the License Agreement would be a clear breach of the agreement. Obligating Defendants to comply with the License Agreement and provide all such documentation to Plaintiff is clearly

15

appropriate, and such an order will prevent a great deal of future delay on a crucial issue in this case. I also find that requiring Defendants to provide proof of the validity of the CDI that Perez held himself out as representing—the corporation whose tax identification number was discovered to be false—would similarly prevent future delay and provide clarity on an important question.

Plaintiff is also entitled to be restored to the position it would have inhabited if Defendants had complied with the rules governing this action. Requiring Defendants to pay for the fees and costs associated with litigating the entry of default and the current cross-motions is clearly an appropriate way to make Plaintiff whole under Fourth Circuit precedent. *See Lolatchy*, 816 F.2d at 953 (holding that award of fees and costs is an appropriate remedy); *Burton*, 2008 WL 1944033, at *5 (holding that when a party defaults, an award of fees and costs is an appropriate lesser sanction).

## IV. CONCLUSION

For the reasons stated herein, I will grant Defendants' Motion to Set Aside Entry of Default and deny Plaintiff's Motion for Default Judgment. I will, however, require Defendants to comply with the terms of the License Agreement by producing to bCreative and its counsel any documents involved with the granting of the licenses to CDI from the original rights holders, within seven days of this opinion and accompanying order's entry. Within the same amount of time, Defendants must provide any proof of the validity of the CDI entity with which Plaintiff dealt during the transactions at issue in the Complaint. Defendants must also pay all of Plaintiff's fees and costs associated with pursuing default. An appropriate order follows.

Entered this  29th  day of July, 2014.

                                                                         NORMAN K. MOON
                                                                         UNITED STATES DISTRICT JUDGE